UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN FERCHAK,                                          Case No. 19-12141

                    Plaintiffs,                        Stephanie Dawkins Davis
v.                                                     United States District Judge

CITY OF BURTON, *et al*.,

                    Defendants.
_____/

**ORDER DENYING IN PART AND GRANTING IN PART
MOTION FOR SUMMARY JUDGMENT (ECF No. 24)**

**I.    PROCEDURAL HISTORY**

Plaintiff, John Ferchak, filed suit against the City of Burton and Sgt. Jeremy

Driggett, a police officer employed by the City of Burton.  (Dkt. 1).  Ferchak

asserts that Driggett violated his constitutional rights when he used excessive force

in effectuating an arrest and he also claims that the City of Burton failed to train

and supervise its officers, contrary to the Constitution.  (ECF No. 15, Amended

Complaint).  Defendants filed a motion for summary judgment, which is fully

briefed, and the court held a hearing via video teleconference on December 22,

2020.  (ECF No. 24, 34).  For the reasons set forth below, the court **DENIES**

defendants' motion for summary judgment on the excessive force claim and

**GRANTS** summary judgment on the *Monell* failure to train/failure to supervise

claim.

1

## II.    FACTUAL BACKGROUND

On April 29, 2018, Ferchak went to a local bar to celebrate his birthday with his friend, Christina Kincaid.  After returning to his house, Ferchak offered to allow Kincaid to sleep in his bedroom while he slept on his couch in the living room.  However, Kincaid became confrontational and began screaming and swearing at Ferchak.  (ECF No. 29-2, pp. 46-47, 52-53).  Kincaid continued to scream while on Ferchak's front porch.  At this point, Ferchak decided that it was best that she went home and told her that he was calling the police.  *Id*. at 53-54.  Kincaid became even more upset, took off her clothes, and ran outside onto the front porch.  *Id*. at 53-54.  Kincaid remained on the porch screaming where she was seen by some of Ferchak's neighbors—John Rockafellow, Cathy Allen, and Carl Dwyer.  *Id*. at 54-56.  Ferchak called the police sometime between 2:30-3:00 a.m.  *Id*. at 56.  Initially, Officer Berry, a female police officer from the City of Burton, arrived at Ferchak's house and was allowed into the residence by Ferchak.  (ECF No. 29-3, pp. 10-11, 13-14).  Ferchak was cordial, polite, and did not appear to be drinking.  He informed Berry that he wanted Kincaid to leave his home.  *Id*. at 10-11.  On the other hand, Kincaid was rude, belligerent, and intoxicated.  (ECF No. 29-2, p. 57; ECF No. 29-3, p. 12).

Officer Berry and  Ferchak were in the process of trying to arrange for an Uber to pick up Kincaid when Officer Hodge, another female police officer from

the City of Burton, who was Officer Berry's superior, entered Ferchak's home while Ferchak was seated at a table off of the living room.  (ECF No. 29-2, pp. 58-59; ECF No. 29-3, pp. 13-14; ECF No. 29-4, pp. 14-15).  Officer Hodge, who Ferchak says had an aggressive demeanor, questioned him about whether he had been drinking and whether Kincaid was physical with him.  (ECF No. 29-2, pp. 59-60).  Ferchak explained that he had some drinks that evening, and that Kincaid had pushed him.  (ECF No. 29-2, p. 59).  Officer Hodge testified that Ferchak was polite, cordial, and did not appear to be under the influence of alcohol.  (ECF No. 29-4, p. 16).  Officer Hodge then turned to Kincaid and told her that she was under arrest for domestic assault in response to which Kincaid screamed, "[f]uck you, bitch, I never touched him."  (ECF No. 29-2, p. 60; ECF No. 29-4, pp. 18-19). Officer Hodge then grabbed Kincaid's arm and according to Ferchak, "catapulted her off the couch right down onto her face."  (ECF No. 29-2, pp. 60-62; ECF No. 29-4, p. 19).

At this time, Ferchak remained out of the way and seated at the kitchen table where his dog laid under the table by his feet.  (ECF No. 29-2, pp. 62-63; ECF No. 29-3, pp. 19-20).  When Ferchak's dog began to growl at the officers and Kincaid, who were all on the floor, he grabbed his dog's collar and both he and his dog remained out of the way where he testified that he was "tucked in back around my table."  (ECF No. 29-2, pp. 63-64; ECF No. 29-3, pp. 21, 24-26; ECF No. 29-4, pp.

20, 22).  Hodge testified that, while they were still inside the house, Ferchak at some point let go of the dog and approached the officers, indicating that he did not want Kincaid to go to jail.  (ECF No. 24-5, pp. 21-22).  Hodge also testified that while Ferchak continued to try to convince them not to arrest Kincaid, he was not "aggressive" toward the officers.  *Id*. at 25.  But, according to Hodge, Ferchak continued to stand near them and interjected himself physically between them as they tried to move Kincaid outside.  *Id.* at 26-28.  Kincaid was handcuffed and moved onto the front porch by Officers Berry and Hodge where they continued to scuffle with her.  (ECF No. 29-2, pp. 65-68).

Ferchak says he followed them to his front porch and shut the front door behind him leaving his dog inside the house.  (ECF No. 29-2, p. 70).  Ferchak explained that Kincaid was out of control and kicking at the officers as she laid on the porch, so he tried to calm her down by holding her head down in an effort to help the officers.  (ECF No. 29-2, pp. 70-71).  Once the officers began to get Kincaid under control, Officer Hodge ordered Ferchak to back up, and he backed up "[s]afely four foot."  (ECF No. 29-2, pp. 70-72).  Hodge describes this incident quite differently.  She says Ferchak kept coming up behind her, hovering "right over the top of me" and she kept telling him to stay back and he did not.  (ECF No. 24-5, pp. 29, 32).  According to Ferchak, he saw Officer Hodge slam Kincaid's face into the floor of his porch several times.  (ECF No. 29-2, pp. 73-74).  While

remaining approximately four feet away, Ferchak said, "[h]ey, she's in handcuffs. You know, this isn't necessary."  (ECF No. 29-2, p. 75, ECF No. 29-15).  After receiving no response, Ferchak took his iPhone from his pocket in a failed attempt to capture the incident on video.  (ECF No. 29-2, pp. 75-76).

Ferchak says he remained in this same location when Sgt. Driggett arrived on the scene, as corroborated by at least three of his neighbors.  (ECF No. 29-5, pp. 24-25, 27; ECF No. 29-7, p. 23; ECF No. 29-6, pp. 11-12, 17, 26, 37).  When Driggett arrived on the scene, Ferchak says he was walking at a "pretty fast pace" across Ferchak's yard toward the front porch.  (ECF No. 29-2, pp. 76, 78-79).  Just before Driggett hit the front steps to the porch, Ferchak says Hodge yelled at Driggett to "[g]et the fucking phone from him."  (ECF No. 29-2, pp. 76, 78-79).  Driggett says that he saw Ferchak with a phone and it appeared that he was recording.  (ECF No. 29-9, pp. 45-46, 85).  According to Ferchak, without saying a word, Driggett then ran onto the porch and chest-butted him, causing him to lose his balance, hit the side porch railing with his body, and his phone to be knocked out of his hand.  (ECF No. 29-2, pp. 38-39, 80-83; ECF No. 29-9, pp. 45-46, 85).  Ferchak maintains that because he realized he was about to be punched by Driggett, he instinctively reacted by raising his non-dominant, left hand to protect himself by blocking Driggett's punch.  He was not fast enough because Driggett already had stepped forward with his left foot and then drew back with his right

arm and punched Ferchak in his right cheek area.  (ECF No. 29-2, pp. 84-86, 142).

The force from the punch caused Ferchak to lose consciousness and when he

awoke, he was lying on his shattered flower planter that had been broken from his

landing on it.  (ECF No. 29-2, pp. 86-87; ECF No. 29-16).

The officers tell a different story.  Hodge says that that Driggett first came to

aid her and Berry with Kincaid and that she told Driggett to keep Ferchak back and

to get Ferchak away from them.  (ECF No. 24-5, p. 35).  According to Hodge,

Driggett told Ferchak to step back and held out one hand to push him back.  *Id*. at

36.  Next, Hodge says that Ferchak cocked his arm back as Driggett pushed him.

*Id*. at 36-37.  She did not see what happened after that.  *Id*. at 38.  Berry testified

that either she or Hodge told Driggett that Ferchak kept trying to pull Kincaid out

from under them and they needed him to get Ferchak away from them.  (ECF No.

24-6, pp. 39-40).  While Berry did not see Ferchak raise his fist to Driggett, she did

hear Driggett say either that Ferchak tried to punch him or that he "cocked back,"

after they both were on the ground.  *Id*. at 46-48.  She did not see Driggett punch

Ferchak.  *Id*. at 53.

Diverging from Hodge's, Berry's and Ferchak's testimony, Driggett testified

that Ferchak was inside the door of the house when he approached the porch.

(ECF No. 24-7, p. 33).  Driggett says he first tried to help the officers with Kincaid

by trying to calm her down.  *Id*. at 33-34.  Then, Ferchak exited the house and

6

became an "immediate threat." *Id*. at 38.  Driggett said he had been told several times that Ferchak had tried to interfere with the arrest, so he told him to get back. *Id*. at 39-40.  Driggett says Ferchak failed to follow the command and did not move. *Id*. at 40.  At some point, Driggett pushed Ferchak and his phone fell out of his hand. *Id.* at 45-46.  After Driggett gave two commands – get back and stay back – he says that Ferchak raised his fist and cocked his arm back. *Id*. at 45. Driggett says he then struck Ferchak in the face with the side of his hand. *Id*. at 52. He grabbed Ferchak to take him down and Ferchak did not comply with commands to put his hands behind his back. *Id.* at 52-53.  Driggett denied punching Ferchak a second time after they were on the ground. *Id*. at 55.

Mr. Rockafellow, Ferchak's next door neighbor, testified that before Ferchak and Driggett went down on the front porch, he observed Ferchak standing there and did not see him move his body in anyway.  (ECF No. 29-6, pp. 18-19, 36).  Ferchak testified that when he regained consciousness while still lying on his back, Driggett was on top of him and punched him in the nose.  (ECF No. 29-2, pp. 87-88, 90-93, 118).  Driggett then rolled Ferchak over, handcuffed him, and took him to his squad car.  (ECF No. 29-2, pp. 87-88, 90-93, 118).  Ferchak, who had a bloody face and shirt, was taken by Driggett to the backseat of his squad car.  (ECF No. 29-2, p. 97; ECF No. 29-5, pp. 23-24; ECF No. 29-6, pp. 25, 36; ECF No. 29-8, pp. 13-14; ECF No. 29-17).  While still at his residence, Ferchak was pulled out

of the patrol car, examined by EMS, and treated for facial injuries.  (ECF No. 29-2, pp. 98-100; ECF No. 29-18).

During transport, Ferchak says that Driggett tried to get him to admit that he balled his fist at him, but Ferchak maintains that did not happen.  (ECF No. 29-2, pp. 102, 105-106, 142).  Specifically, the in-car video/audio transcript of the conversation between Ferchak and Driggett captured, in pertinent part, the following:

> Ferchak: I'll tell you what, Dude. You hit me pretty good.  (ECF No. 29-19, p. 2; ECF No. 29-24, 3:27:45-3:27:47)
> ***
> Ferchak: I actually thought I was helping you guys. I was helping them girls. That's what really bugs me.  (ECF No. 29-19, p. 3; ECF No. 29-24, 3:29:23-3:29:28).
> ***
> Driggett: But you were doing nothing, but standing there with your phone in your hand.  (ECF No. 29-19, p. 3; ECF No. 29-24, 3:29:39-3:29:41)
> ***
> Driggett: John, I'm gonna be straight with you. When I told you to back up (unintelligible), what was your hand doing?  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:03-3:30:11)
>
> Ferchak: I just actually was— (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:12-3:30:13)
>
> Driggett: You balled your fist up.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:12-3:30:13)
>
> Ferchak: I thought you were gonna hit me. So I put my hand up.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:13-3:30:15)

8

Driggett: You balled your fist up like you were going to throw a punch at me.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:15-3:30:18)

Ferchak: I thought you were going to hit me. Well, you did, but— (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:18-3:30:21)

Driggett: I did at the end.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:20-3:30:22)

Ferchak: Yeah.  (ECF No. 29-19, p. 4; Ex. W, 3:30:22)

Driggett: You balled your fist up, yeah.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:22-3:30:23)

Ferchak: Listen, young man, okay? I'm not that type of person at all.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:23-3:30:29)

Driggett: Okay.  (ECF No. 29-19, p. 4; ECF No. 29-24, 3:30:30)

Ferchak: And if you thought that for a minute, I really apologize because I'm not that kind of person. Look at my record.  (ECF No. 29-19, p.4; ECF No. 29-24, 3:30:31-3:30:39)

Upon arriving at the Genesee County Jail, a nurse informed Driggett that Ferchak needed medical treatment and, in particular, that he needed stitches above his right eye.  (ECF No. 29-2, p. 104; ECF No. 29-9, p. 24).  Driggett subsequently transported Ferchak to Hurley Hospital where he was diagnosed with a broken nose and a blowout right orbital fracture among other injuries.  (ECF No. 29-2, p. 130; ECF No. 29-20).  As a result of his injuries, Ferchak has sought and continues

to seek medical treatment including, but not limited to, surgery on May 7, 2018, which included an open reduction fracture right orbital floor, and closed reduction nasal and septoplasty.  (ECF No. 29-21).

Ferchak was charged with three counts of resisting and obstructing the police and pleaded guilty to one charge of resisting and obstructing the police. (ECF Nos. 24-3; 29-22).

## III.   DISCUSSION

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Hence, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, then on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

     B.    <u>Excessive Force/Qualified Immunity</u>

        1.    Legal standards

The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell*

*v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)).  Defendants bear the burden of pleading qualified

immunity, but plaintiff bears the burden of showing that the defendant's conduct

violated a right so clearly established that a reasonable official in his or her

position would have clearly understood that he or she was under an affirmative

duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.

2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the

plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test in order to determine

whether qualified immunity is applicable to a particular situation.  *Saucier v. Katz*,

533 U.S. 194, 201 (2001).  The first part of the test involves a determination of

whether the facts of the case, viewed in the light most favorable to the plaintiff,

"show the officer's conduct violated a constitutional right."  *Id*.  If the first

question was resolved in the affirmative, then the court would decide "whether the

right was clearly established."  *Id*.  If both questions were resolved in the

affirmative, then the doctrine of qualified immunity would not apply, and the case

could proceed.  The Supreme Court later revisited its formulation and discarded the

mandatory sequencing of the two-part qualified immunity test, finding that it was

no longer sound based on several factors, including judicial economy.  *Pearson v.*

*Callahan*, 555 U.S. 223, 227 (2009).  "This generally means that 'we are free to

consider those questions in whatever order is appropriate in light of the issues

before us.'" *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (quoting

*Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009)).

Under the "clearly established" prong of the qualified immunity test, the

contours of the right must be sufficiently clear such that a reasonable official

would understand that what he is doing violates that right. *Anderson v. Creighton*,

483 U.S. 635, 640 (1987). "A clearly established constitutional violation requires

on-point, controlling authority or a robust consensus of cases of persuasive

authority." *Ortega v. U.S. Immigration and Customs Enforcement*, 737 F.3d 435,

439 (6th Cir. 2013). "[C]laims that law enforcement officers have used excessive

force - deadly or not - in the course of an arrest, investigatory stop, or other

'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). In

determining whether a constitutional violation based on excessive force has

occurred, the Sixth Circuit applies "the objective-reasonableness standard, which

depends on the facts and circumstances of each case viewed from the perspective

of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*,

489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395-96). "The

calculus of reasonableness must embody allowance for the fact that police officers

are often forced to make split-second judgments-in circumstances that are tense,

14

uncertain, and rapidly evolving-about the amount of force that is necessary in a

particular situation." *Graham*, 490 U.S. at 396-97. "Relevant considerations

include 'the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting

arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236 (quoting

*Graham*, 490 U.S. at 396).

Fortunately, the contours of the Fourth Amendment's prohibition on

excessive force are well-defined. Under long-standing case law in this circuit,

"there undoubtedly is a clearly established legal norm precluding the use of violent

physical force against a criminal suspect who already has been subdued and does

not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d

356 (6th Cir. 2009) (citing *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ("The

general consensus among our cases is that officers cannot use force ... on a

detainee who has been subdued" and "is not resisting arrest."). Additionally, as

explained in *Hermiz v. Budzynowski*, 2017 WL 2546793, *7 (E.D. Mich. June 13,

2017) (Lawson, J.), the Sixth Circuit has long "held that mere noncompliance is

not active resistance." *Woodcock v. City of Bowling Green*, 2017 WL 633385, at

*4 (6th Cir. Feb. 16, 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314,

323-24 (6th Cir. 2015) (holding that refusal to comply with an officer's command

to step outside the apartment was not active resistance); *Eldridge v. City of*

*Warren*, 533 Fed. Appx. 529, 535 (6th Cir. 2013) ("If there is a common thread to be found in our case law on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more.")).  The court of appeals has "long distinguished active resistance by arrestees from passive resistance." *Jackson v. Washtenaw County*, 678 Fed. Appx. 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)).  "The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson*, 678 Fed. Appx. at 306 (citing *Goodwin*, 781 F.3d at 323; *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)). "The latter is generally shown by the lack of physical resistance or verbal antagonism." *Jackson*, 678 Fed. Appx. at 306 (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge*, 533 Fed. Appx. at 535).

2.   Analysis

Driggett argues that the record evidence demonstrates that the force employed by him was reasonable, and therefore, constitutional.  Driggett points out that Ferchak pleaded guilty to resisting and obstructing;[1] that he has admitted that

---

[1]  Driggett does not argue, however, that Ferchak's conviction necessarily bars his excessive force claim. *See e.g.*, *Ruemenapp v. Oscoda Twp., Mich*., 739 Fed. Appx. 804, 810 (6th Cir. 2018) ("[I]n Michigan, one can be convicted under § 750.81d(1) simply for a 'knowing failure to comply with a lawful command,' Michigan Compiled Laws § 750.81d(7)(a), and the mere failure ... to obey a police order' does not render reasonable whatever degree of force an officer exerts upon an arrestee.") (quoting *Schreiber v. Moe*, 596 F.3d 323, 335 (6th Cir. 2010)).

he was told to get back; and that he raised his hand to Driggett.  Accordingly, Driggett argues that Ferchak posed an immediate threat to the officers on scene and that he resisted commands to get back and to stop interfering with the lawful arrest of Kincaid.  Driggett maintains that he acted reasonably when he pushed Ferchak back away from other officers and in striking Ferchak when it appeared that Ferchak was going to strike Driggett.

Had Ferchak merely failed to comply with Driggett's commands, this claim would fall into the category of passive resistance and the use of force would likely be unconstitutional.  However, paired with verbal antagonism or a show of physical force (here, the raised fist alleged by Driggett), the use of force may be constitutional.  Yet, such a conclusion would require the court to accept Driggett's version of the facts as true, something it may not do on a motion for summary judgment.  The Court of Appeals faced a similar question in *Gradisher v. City of Akron*, 794 F.3d 574 (6th Cir. 2015), finding a material question of fact that precluded summary judgment on the plaintiff's excessive force claim:

> The parties dispute whether or not Gradisher was resisting or refusing to be handcuffed.  The officers claim that Gradisher repeatedly pulled his arms back when they attempted to handcuff him.  They assert that Gradisher kept reaching his hands towards his waistband, possibly for a weapon, and would not comply with their commands to give up his arms both before and during the tasing.  Gradisher, conversely, says that when the officers pulled the sheet off of him, he held his hands up and his legs out, and said "You got me, You got me," yet they

17

> deployed the taser "[a]t that time."  He also claims that
> the officers gave no warning before immediately tasing
> him, and they continued to tase him even though he could
> not follow orders since he was incapacitated by the
> tasing.  Thus, whether Gradisher resisted or not and
> whether he was given an opportunity to comply with
> commands before, and while, being tased are material
> facts in dispute.  "Where, as here, the legal question of
> qualified immunity turns upon which version of the facts
> one accepts, the jury, not the judge, must determine
> liability."  *Sova* [*v. City of Mt. Pleasant*, 142 F.3d 898,
> 903 (6th Cir. 1998)].

*Id*. at 585-86.  The circumstances in this case are difficult to distinguish from those

in *Gradisher*.  If a jury accepts Ferchak's version of events, Driggett began to use

force (the chest bump) on Ferchak before even being given a command by him.

And if Ferchak's version of events are accepted, a jury could infer that Driggett set

the strike in motion *before* Ferchak raised his hand to defend himself, given

Ferchak's testimony that he raised his hand to protect himself from an incoming

blow.  In addition, Ferchak maintains that Driggett did not speak with the other

officers before his approach and thus, a jury could infer that Driggett was not

apprised of Ferchak's prior attempts to interfere with the arrest of Kincaid, as

characterized by Hodge and Berry.  Under such circumstances, a reasonable jury

could conclude that Ferchak did not fail to follow a command and there was no

other evidence of active resistance.  Conversely, if a jury accepts Driggett's

version of events, it could reasonably conclude that Ferchak's conduct constituted

active resistance and the use of force was objectively reasonable and constitutional.

18

Given that material facts are in dispute, the Court cannot decide qualified

immunity as a question of law. *Harris v. City of Circleville*, 583 F.3d 356, 364

(6th Cir. 2009) ("When no facts are in dispute, whether an official receives

qualified immunity is a question of law.").

The court is not persuaded by defendants' argument that this was a "mistake

of fact." According to defendants, the incident at most was a misunderstanding

based on the actions of Ferchak that led to Driggett defending himself. A similar

argument was rejected by the Court in *Harris v. Lasseigne*, 2013 WL 6537805, at

*7 (E.D. Mich. Dec. 13, 2013) (Steeh, J.), aff'd in part, dismissed in part, 602 Fed.

Appx. 218 (6th Cir. 2015). In *Harris v. Lasseigne*, the defendant argued that even

if he was mistaken that the decedent had dropped or thrown his weapon just

moments before the defendant shot him, the mistake was honest and reasonable

under the circumstances. *Id*. The court found that the issue would come down to

whether the gun held by the decedent went over the fence before or after he was

shot by the defendant, which was dependent on which version of the facts were

accepted. *Id*. The court concluded that, while it was a close case, the evidence

considered in the light most favorable to the plaintiff could lead a factfinder to

conclude that the decedent was not armed when he was shot. *Id*. Thus, it was "up

to the jury to determine the sequence of events, interpret the evidence, and assess

the accuracy and credibility of the various witnesses' testimony about what

19

happened." *Id*.  Similarly, the jury must sort out whether Ferchak raised his hand

(or fist) *before* Driggett initiated the strike or whether Ferchak raised his hand (or

fist) *in response* to Driggett's impending strike.

Moreover, the facts of the present dispute are unlike those where a

reasonable mistake of fact is at issue.  For example, in *Simmonds v. Genesee

County*, 682 F.3d 438 (6th Cir. 2012), the court found qualified immunity applied

where the totality of the circumstances as known to the defendants at the time,

warranted the use of deadly force:

> The officers were aware that Kevin [the decedent] had
> threatened to kill his ex-girlfriend's parents, as both
> Simmonds and Carey separately called 911 to report
> these threats.  The officers were further informed that
> Kevin had been drinking, was displaying mentally
> unstable behaviors, and was possibly suicidal.  They also
> knew that Kevin owned a pistol and a shotgun and that he
> might be armed.  Once the officers came into contact
> with Kevin, he refused to comply with their request to
> raise his hands and exit his truck, and instead shifted the
> truck into reverse and fled into a heavily-wooded area of
> his parent's property.  After Kevin's vehicle became
> stuck in the snow, he again ignored repeated orders to
> show his hands and, even after officers attempted to use a
> taser to subdue him, threatened the officers by yelling "I
> have a gun," and brandishing a silver object, and pointing
> it at the officers, as if it were a weapon.  Although 20/20
> hindsight now informs us that Kevin was unarmed at the
> time, all of the information available to the officers at the
> time they used force constituted probable cause that
> Kevin "pose[d] a threat of serious physical harm...."

*Id*. at 445.  Importantly, there was no evidence contradicting the officer's assertion that the decedent in *Simmonds* brandished a silver object or yelled that he had a gun.  Rather, the "mistake" was that it turned out that the decedent was unarmed.  Yet, the officers reasonably believe that the decedent was armed and posed a serious threat.  In contrast, Driggett does not identify any facts that he reasonably believed to justify his use of force, which turned out not to be true.  While Driggett tries to say that even if he was mistaken about Ferchak's raised fist, he was still justified in his use of force because he reasonably believed Ferchak was going to hit him, this requires the court to accept his version of the facts.  Again, the jury must sort out whether Ferchak raised his hand (or fist) before Driggett initiated the strike or whether Ferchak raised his hand (or fist) in response to Driggett's impending strike.  Thus, there is not a reasonable mistake of fact issue before the court suggesting that summary judgment in favor of Driggett is appropriate.

Finally, the court is not presented with the exceedingly rare *Scott v. Harris* situation.  In *Scott*, the Supreme Court created an exception to the standard that a defendant challenging a denial of qualified immunity on interlocutory appeal "must be willing to concede the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Landis v. Phalen*, 297 Fed. Appx. 400, 404 (6th Cir. 2008) (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 435 (6th Cir. 2001)).  In *Scott*, the Supreme Court held that where a district court's denial of qualified

immunity turns on a disputed issue of material fact and one side's version of those facts is "blatantly contradicted by the record, so that no reasonable jury could believe it a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. *Scott's* exception, however, applies only to the "rare" case at the "outer limit" where a district court makes a "blatan[t] and demonstrabl[e] error." *Landis*, at *Wysong v. City of Heath*, 260 Fed. Appx. 848, 853 (6th Cir. 2008) (quoting in part *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007)). In *Scott*, the video evidence was indisputable. The video evidence showed, contrary to the respondent's version of events, his "vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast," "swerve[ing] around more than a dozen other cars, cross[ing] the double-yellow line, and forc[ing] cars traveling in both directions to their respective shoulders to avoid being hit." The video also showed the vehicle running "multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up." The Supreme Court described the events on the video as a "Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id*. at 379-80. As a result, the respondent's version of events was irredeemably rebutted and contradicted. Therefore, the Court concluded that

the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id*. at 380.

Notably, not all video evidence triggers this exception. Indeed, in other circumstances where there is video evidence of even part of the incident in question, *Scott v. Harris* has been deemed inapplicable. Compare *Hermiz v. Budzynowski*, (partial video of tasing and use of other force, question of fact found), with *Banks v. Twardesky*, 2011 WL 891193, at *5 (E.D. Mich. 2011) (Hluchaniuk, M.J.), report and recommendation adopted, 2011 WL 891181 (E.D. Mich. 2011) (Duggan, J.) (No factual issue found where entire incident captured on the videotape and it was plainly evident that plaintiff was not subdued and had not stopped resisting at the time the pepper spray was administered); s*ee also Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (explaining that *Scott* "instructs us to determine as a matter of law whether the events depicted on [a] video, taken in the light most favorable to [the nonmoving party], show that the Officers' conduct was objectively reasonable."). Only where claimed "material issues of fact" are plainly contradicted by the video evidence of events in question, summary judgment may be granted in favor of defendants. *See e.g.*, *Griffin v. Hardrick*, 604 F.3d 949, 955-56 (6th Cir. 2010).

Here, none of the incident was captured on video, which distinguishes this case from *Scott v. Harris*. *See Griffin*, *supra*. Instead, defendants rely on the video

evidence of the conversation between Ferchak and Driggett captured by the dash

cam in the police cruiser while Driggett transported Ferchak to the police station.

Ferchak's statements are not so inconsistent with his testimony such that the court

is presented with a *Scott v. Harris* situation.  Ferchak stated that he put his hand up

because he thought Driggett was going to hit him.  While Ferchak apologized to

Driggett for what happened, it is clear he was sorry that Driggett thought he was

raising his fist at him.  (ECF No. 29-19, p. 4).  Ferchak went on to maintain that he

believed he did not do anything wrong.  *Id*. at 14.[2]  The material issues of fact

posited by Ferchak are not "plainly contradicted" by the video evidence, as

defendants suggest.

C.    *Monell* Claim Against the City of Burton

"When determining whether a municipality has adequately trained its

employees, 'the focus must be on adequacy of the training program in relation to

the tasks the particular officers must perform.'"  *Wright v. City of Euclid*, 962 F.3d

852, 881 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 834

(6th Cir. 2019)).  "To succeed on a failure to train or supervise claim, the plaintiff

must prove the following: (1) the training or supervision was inadequate for the

---

[2]  Defendants also point to Ferchak's admission that one of the female officers told him to stay back and to back up.  This does not help Driggett because of the contradictory testimony about whether he even spoke with the officers at the scene before approaching Ferchak.  Thus, to the extent it is pertinent to Driggett's use of force against Ferchak, there is a factual dispute as to whether Driggett was aware that the other officers had given such orders to Ferchak.

tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 286-287 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)).  In other words, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." *City of Canton*, 489 U.S. at 388.

As explained in *Ouza*, there are "at least two situations in which inadequate training could be found to be the result of deliberate indifference." *Id*. at 287 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003).  First, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id*. (citation omitted).  Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury" and yet "ignored a history of abuse." *Id*. (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Ferchak seems to assert a claim in this category.  He argues that Driggett's record shows a pattern of recklessness with his police cruiser, with him having

been disciplined for driving over 100 mph without his lights or sirens activated and rear ending a suspect's vehicle.  (ECF No. 29, Ex. Z).  He was also suspended because of a citizen complaint that was later withdrawn and he has been a defendant in two other excessive force lawsuits.  Ferchak's claim is fatally flawed. He does not connect the dots between Driggett's disciplinary history and any lack of training by the City of Burton.  Driggett underwent multiple training courses over several years and Ferchak does not provide any evidence that these courses did not include training on the appropriate use of force.  And even if Driggett never received any training on the appropriate use of force, the question before the court is whether the City of Burton was on notice that its training program was inadequate because of a pattern of similar constitutional violations.  Ferchak has not offered evidence of a pattern of similar constitutional violations.  At best, he says that Driggett was a defendant in two prior excessive force suits.[3]  While he provides a copy of a case denying summary judgment in one prior excessive force case, he does not offer any analysis regarding the similarity between the incidents, and the decision does not conclude that Driggett committed a constitutional violation.  Importantly, "prior examples of wrongdoing must violate the same constitutional rights and violate them in the same way."  *Campbell v. Cheatham*

---

[3] Driggett's history of discipline involving his police cruiser does not appear to implicate any constitutional violations.

*Cty. Sheriff's Dep't*, 2021 WL 37674, at *13 (M.D. Tenn. Jan. 5, 2021) (quoting

*Berry v. Delaware Cnty. Sheriff's Off.*, 796 Fed. Appx. 857, 863 (6th Cir. 2019)

(citing *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014)); *see also*

*Connick v. Thompson*, 563 U.S. 51, 63 (2011) (footnote omitted) ("Because those

incidents are not similar to the violation at issue here, they could not have put

Connick on notice that specific training was necessary to avoid this constitutional

violation.").  Accordingly, the court concludes that Ferchak has failed to establish

deliberate indifference based on a pattern of similar constitutional violations.

Second, in a "narrow range of circumstances," a plaintiff can show that a

municipality was deliberately indifferent by "fail[ing] to equip law enforcement

officers with specific tools to handle recurring situations."  *Id.* (quoting *Bd. of*

*Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).  As the Supreme Court explained

in *City of Canton*, "it may happen that in light of the duties assigned to specific

officers or employees the need for more or different training is so obvious, and the

inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the city can reasonably be said to have been deliberately

indifferent to the need."  489 U.S. at 390.  With respect to this second category, the

*Ouza* decision went on to suggest that "if a municipality failed to provide any

training to its officers on the use of deadly force, it would be liable to a person

unconstitutionally killed by the police, given that 'city policymakers know to a

27

moral certainty that their police officers will be required to arrest fleeing felons'
and '[t]he city has armed its officers with firearms, in part to allow them to
accomplish this task.'"  *Id.* at 287-288 (quoting *City of Canton*, 489 U.S. at 390
n.10).  In that situation, "the need to train officers in the constitutional limitations
on the use of deadly force ... can be said to be 'so obvious,' that failure to do so
could properly be characterized as 'deliberate indifference' to constitutional
rights."  *Id.* (internal citation omitted).  Under this approach of demonstrating
deliberate indifference, a plaintiff need not show that the municipality had notice
of a pattern of unconstitutional conduct.  *Id.* (citing *Shadrick v. Hopkins County*,
805 F.3d 724, 739 (6th Cir. 2015)).  Instead, a plaintiff can show deliberate
indifference based on "single-incident liability" if the risk of the constitutional
violation is so obvious or foreseeable that it amounts to deliberate indifference for
the city to fail to prepare officers for it.  *Id.* (citing *Connick v. Thompson*, 563 U.S.
51, 63 (2011)).

 Ferchak also makes a claim that falls into the second category.  He contends
that Driggett's training records reveal that he has not received any training since
2013, over four years before incident at issue here.  And, Ferchak contends that
none of Driggett's training indicates that he received any instruction specifically
regarding the use of force.  According to Ferchak, it is foreseeable that officers will
encounter situations where they must decide what level of force is appropriate and

where no such training is provided, inevitably, they will use unreasonable and unconstitutional force.  Yet, Driggett testified he receives training every year with "PPCT."  (ECF No. 24-7, p. 9).  "For liability to attach in the instance of a single violation, the record must show 'a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.'"  *Harvey v. Campbell Cnty., Tenn.*, 453 Fed. Appx. 557, 567 (6th Cir. 2011) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).  Given Driggett's yearly training, and the lack of evidence posited by Ferchak that such training was grossly inadequate, Ferchak is unable to create a genuine issue of material fact on his claim that the City of Burton failed to prepare its officers on the appropriate force such that a single violation establishes a constitutionally deficient training policy.[4]

## IV.   CONCLUSION AND ORDER

For the reasons set forth above, the court **DENIES** defendant Driggett's motion for summary judgment on the excessive force claim and **GRANTS** his

---

[4] Given the conclusion that the City of Burton is entitled to summary judgment on Ferchak's failure to train claim, the court also grants summary judgment on the co-extensive claim against Driggett in his official capacity.  *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985)) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

motion for summary judgment on the claim against him in his official capacity,

and **GRANTS** defendant City of Burton's motion for summary judgment.

   **IT IS SO ORDERED**.

Date: February 28, 2021                s/Stephanie Dawkins Davis
                                       Stephanie Dawkins Davis
                                       United States District Judge